NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11471

COMMONWEALTH  vs.  ELBERT NEWSON.


Suffolk.     December 5, 2014. - April 14, 2015.

Present:  Gants, C.J., Spina, Cordy, Duffly, & Lenk, JJ.


Homicide.  Firearms.  Joint Enterprise.  Constitutional Law,
     Voluntariness of statement, Waiver of constitutional
     rights, Fair trial.  Evidence, Voluntariness of statement.
     Practice, Criminal, Capital case, Motion to suppress,
     Voluntariness of statement, Waiver, Instructions to jury.



Indictments found and returned in the Superior Court
Department on December 8, 2008.

A pretrial motion to suppress evidence was heard by
Christine M. McEvoy, J., and the cases were tried before her


Stephen Paul Maidman for the defendant.
Elisabeth Martino, Assistant District Attorney (Julie
Higgins & David J. Fredette, Assistant District Attorneys, with
her) for the Commonwealth.


LENK, J.  Thomas Webb was fatally shot on September 15,

2008, while petting a neighbor's dog on a sidewalk outside an

apartment building in Boston.  The defendant was arrested a

short time later, after fleeing from police in a vehicle and

then on foot.  At trial, the Commonwealth did not offer evidence that the defendant fired the fatal shots.  Instead, the Commonwealth proceeded against the defendant on a theory of joint venture with the individual who did fire the fatal shots, and who was in the vehicle with the defendant before the shooting and during the flight from police.  The defendant, in turn, conceded his presence at the scene of the shooting and his involvement in the subsequent police chase.  He asserted, however, that he did not know that the shooting was planned, and that his role was limited to aiding in the escape after the shooting occurred.

In December, 2011, a Superior Court jury found the defendant guilty of murder in the first degree on a theory of extreme atrocity or cruelty.  The jury also found the defendant guilty of one count of possessing a firearm without a license, and not guilty of another count of possessing a firearm without a license.  The defendant contends on appeal that the trial judge erred in (1) denying the defendant's motion to suppress statements that he made to police following his arrest, which were used to challenge his credibility when he testified at trial; and (2) declining to instruct the jury on the uncharged offense of accessory after the fact, which he argues deprived him of a defense.  Because we conclude that there was no error,

and our review of the entire record provides no basis to grant relief under G. L. c. 278, § 33E, we affirm the defendant's convictions.

1.  Background.  "We summarize the evidence at trial, in the light most favorable to the Commonwealth," reserving some facts for later discussion.  Commonwealth v. Deane, 458 Mass. 43, 44 (2010).

Shortly after 9 P.M. on September 15, 2008, two Boston police officers heard the sound of gunfire.  One of the officers testified that he believed that the gunshots came "from two different firearms."

Responding to the area from which the gunfire came, the officers observed a dark Nissan Maxima automobile, with tinted windows and Rhode Island registration plates, parked in the middle of Parker Street.  A thin African-American man wearing a white T-shirt ran towards the vehicle's front passenger's side door and entered.  The officers attempted to block the suspect vehicle using their police cruiser, but the vehicle evaded the police and drove off.

A chase ensued.  While pursuing the suspect vehicle using their flashing blue lights and sirens, the officers observed an object thrown out of the vehicle's passenger's side window.  A .45 caliber semiautomatic pistol was later recovered from that

spot along the chase route. The suspect vehicle eventually entered the Academy Homes housing development in Boston and stopped abruptly, and two individuals stepped out. The person who stepped from the passenger's side door was again an African-American man with a thin build wearing a white T-shirt. The person who emerged from the driver's side door was a shorter African-American man with a "stocky build," wearing a "dark sweatshirt" and "dark jeans."

The chase continued on foot, but the police officers lost sight of both individuals. A short time later, different police officers, responding to dispatches about the shooting and chase broadcast over the police radio, observed the defendant emerged from hedges onto a nearby sidewalk. The defendant was "sweating profusely" and "gasping for air." He was wearing a red T-shirt and jeans. A gray hooded sweatshirt was later discovered next to some bushes and shrubbery near the location where the defendant was stopped. Approached by the officers, the defendant indicated that he was coming from the home of his girl friend, "Pookie."

The defendant was handcuffed and taken to the homicide unit at Boston police headquarters. When detectives first approached the defendant seeking to interview him, he became ill and vomited. The defendant smelled of alcohol, and it was clear to

Detective Dennis Harris, the interviewing detective, that the defendant had been drinking. Indeed, during the interview, the defendant stated several times that he was "drunk," was feeling "nice," and was "totaled from the junk." He also indicated that he was "nauseous" and that his "stomach [was] bubbling." Nevertheless, Harris testified that the defendant was not "stumbling or staggering" and "walked unassisted . . . into the interview room," and that during the interview the defendant appeared nervous but alert. During the course of the interview, which lasted approximately two hours and twenty minutes, the defendant took two breaks, was permitted to use the telephone and the bathroom facilities, and was provided water and snacks.

At the beginning of the interview, Harris read the defendant the Miranda warnings, see Miranda v. Arizona, 384 U.S. 436, 444 (1966), and the defendant initialed and signed a form confirming that the warnings had been given. The defendant also consented to have the interview electronically recorded, as urged by this court in Commonwealth v. DiGiambattista, 442 Mass. 423 (2004). When the defendant asked near the beginning of the interview whether he was "being arrested," however, Harris responded, "No," indicating, "this is just an interview at this point."

Throughout the interview, the defendant continued to assert

that he had no involvement in either the shooting or the police chase, and had been with his girl friend "Pookie" prior to his arrest. He stated that "Pookie" resided in the Academy Homes housing development. He could not, however, give her address, full name, or telephone number, and could not say definitively how long he had been with her prior to being stopped by the police.

At no point during the interview did the defendant make an inculpatory statement. After Harris repeatedly exhorted the defendant to provide any information that he might have about the shooting and the police chase, the defendant asked if he could leave. Harris indicated that the defendant could not leave, because he was under arrest for possessing marijuana that had been found on his person when he was stopped by police.[1] After Harris urged the defendant once more to tell him anything that he knew about the shooting, the defendant invoked his right to counsel, and the interview concluded.

During the second break in the interview, the detectives took the defendant's clothing and provided him with other clothes to wear. The detectives also took swabbings from the

---

[1] The defendant's arrest occurred several months before voters of the Commonwealth adopted, via ballot referendum, "An Act establishing a sensible state marihuana policy," which decriminalized possession of one ounce or less of marijuana. See G. L. c. 94C, § 32L.

defendant's hands to test for gunshot residue. In the right front pocket of the defendant's jeans the detectives found a door key to a Nissan Maxima; this key opened the vehicle abandoned near the Academy Homes housing development following the police chase. Inside the vehicle police found a cellular telephone matching a holder carried by the defendant when he was arrested. During the police interview, however, the defendant had indicated that he had left his telephone with his mother that day. Forensic examination of the vehicle's contents also identified several objects with the defendant's fingerprints. These included a .38 caliber revolver, which was found on the floor of the front passenger area and contained two of the defendant's fingerprints, along with the fingerprint of Richard Allen, a friend of the defendant. Neither the defendant's nor Allen's fingerprints, however, were found on the .45 caliber pistol that police had seen thrown from the suspect vehicle during the pursuit. Instead, forensic examination of that pistol revealed the fingerprint of another individual, Michael Gaines.

Five shell casings were recovered from the scene of the shooting. The Commonwealth's ballistics expert testified at trial that, "to a reasonable degree of ballistic certainty," all had been shot by the .45 caliber pistol that police had

recovered along the chase route.[2] Five bullets or bullet casings were also recovered: one from Ziegler Street, where another shooting had taken place approximately twenty minutes before the shooting on Parker Street; two from the victim's body; and two others from Parker Street. The Commonwealth's ballistics expert testified, again "to a reasonable degree of ballistic[] certainty," that all came from the same .45 caliber pistol. No projectiles were conclusively traced to the .38 caliber revolver, although there were several projectiles that the Commonwealth's ballistics expert testified could have come from the revolver.

The defendant was indicted for murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty, and for two counts of carrying a firearm without a license, based on the .45 caliber pistol and the .38 caliber revolver. At trial, the Commonwealth did not seek to establish that the defendant fired any of the shots that killed the victim. Instead, the Commonwealth contended that the defendant was responsible because he assisted another individual, whom the Commonwealth never expressly identified, who carried the .45 caliber pistol and fired the fatal shots.

---

[2] The Commonwealth's ballistics expert's testimony conformed to the guidelines that this court outlined in Commonwealth v. Pytou Heang, 458 Mass. 827, 846-849 (2011).

The core issue at trial was the defendant's mental state at the time of the shooting. The Commonwealth offered evidence to establish the defendant's prior awareness of and intent to participate in the shooting. The Commonwealth presented testimony indicating that the same Nissan Maxima had been involved in an earlier incident of gunfire on Ziegler Street, supporting the inference that the defendant knew that his passenger had a gun and that further shooting was planned. Tests of the swabs taken from the defendant's hands showed traces of gunshot residue, which the Commonwealth offered as showing that the defendant had fired the .38 caliber revolver at some time that evening. Finally, the Commonwealth contended that the defendant's rapid departure immediately after the shooting on Parker Street indicated that he was "fully aware of the plan."

The defense offered an alternative account of the evening's events. Testifying as the sole defense witness, the defendant stated that there were actually three individuals in the Nissan Maxima at the scene of the shooting: Michael Gaines, Richard Allen, and the defendant. The defendant contended that Gaines and Allen carried the two firearms and did the shooting, but that he had no prior awareness of the planned shooting, and that his role was limited to aiding Allen and Gaines in the escape

from police after the fact.  The defendant stated that on the evening of the shooting he had loaned the Nissan Maxima to Allen, who indicated that he wanted the vehicle to conduct a drug deal.  Allen, now accompanied by Gaines, returned with the vehicle shortly after 9 P.M. and picked up the defendant. Gaines moved to the back seat, and the defendant began driving. Allen asked the defendant to drive to Parker Street to pick up his girl friend.  When they arrived, Allen indicated that the defendant should make a U-turn and stop, and Gaines got out of the vehicle.  As the defendant was turning to Allen to ask why Gaines had gotten out, given that it was supposedly Allen's girl friend that they were going to visit, the defendant heard gunfire.  Allen then jumped out of the vehicle.  Both Allen and Gaines got back into the vehicle once the police arrived.  Allen ordered the defendant, "Drive."  The defendant complied, and police officers arriving on the scene gave chase.  When the defendant stopped the vehicle later in the Academy Homes housing development, Allen handed the .38 caliber revolver to the defendant, asking him to throw it in the bushes.  The defendant instead dropped it on the floor of the front passenger area and fled.

The Commonwealth challenged the defendant's account in a number of ways.  Most importantly for purposes of this appeal,

the Commonwealth undermined the defendant's credibility through the inconsistency between the defendant's recorded interview with police, which had been introduced in evidence, and his trial testimony. The defendant admitted that he lied to police during the interview, fabricating "Pookie" and falsely denying that he was involved in the police chase. He testified that he made those statements to police because he was scared and did not want to "tell on" Allen and Gaines.

The Commonwealth also identified several other factors that, it contended, undermined the defendant's account. The Commonwealth pointed out that the two officers involved in the chase only saw two individuals flee from the Nissan Maxima, not three; that no witnesses had seen a third person in the vehicle; and that, when police searched the Nissan Maxima, the front seat was pushed far back, leaving little room for anyone to sit in the back seat. The Commonwealth called the jury's attention to how "conveniently" the defendant's timeline absolved him of involvement in the earlier Ziegler Street shooting, insofar as the defendant testified that he was picked up by Allen and Gaines shortly after 9 P.M., just after the occurrence of the gunfire on Ziegler Street. Finally, the Commonwealth noted that the defendant testified that he "wasn't close with" Gaines, and that Allen, whom the defendant testified was "very close" to

him, was deceased at the time of the trial. "So you're saying the guy who you're not close with and the dead guy are the ones who did this[?]" the Commonwealth asked in cross-examining the defendant.

The Commonwealth never offered evidence of a motive for the shooting. The victim was the youngest of seven siblings. At the time of his death, he was preparing to begin his final year of high school.

2. <u>Discussion</u>. a. <u>Admission of the defendant's statements to police</u>. Before trial, the defendant moved to suppress the statements made during his police interview. He argued that he did not knowingly, intelligently, and voluntarily waive his Miranda rights and that the statements themselves were not voluntary. In making that argument, he focused on the alleged "trickery" and "deceit" involved in Harris's initial assurance that he was not under arrest, when in fact he had been arrested for possession of marijuana. The defendant also asserted that he was under the influence of alcohol and drugs during the interview.

The judge, who was also the trial judge, held a hearing on the defendant's motion to suppress, at which Harris testified. Harris stated that he did not learn that the defendant had been arrested for possession of marijuana until the second break in

the interview, which occurred after he had assured the defendant that he was not under arrest. Harris also acknowledged witnessing the defendant "thr[o]w up the contents of his stomach on the floor," and that "[i]t was clear" to Harris that the defendant "had been drinking," as "[t]here was an odor of alcohol emanating from him." Harris stated, however, that the odor was "not . . . strong," that the defendant was not "stumbling or staggering" and "walked unassisted into the interview room," and that the defendant did not manifest the "glassy eyes, slurred speech, . . . or . . . lack of coordination" characteristic of people under the influence of alcohol or drugs.

The judge denied the defendant's motion to suppress. The judge found that the defendant was subjected to custodial interrogation, and that the Miranda warnings were properly given. With respect to the validity of the defendant's Miranda waiver, the judge found that, although the evidence indicated that the defendant had consumed alcohol and drugs prior to the interrogation, and vomited shortly before the interview, the waiver was nevertheless voluntary. The judge credited Harris's testimony that he "did not observe any outward signs commonly associated with intoxication." The judge further indicated that the recording of the interrogation demonstrated that the

defendant answered the detective's questions in a "responsive and coherent manner," was "well aware of his precarious state," and provided responses that were "self-serving." With respect to the general voluntariness of the statements that the defendant made, the judge observed: "As to trickery and deceit, the court finds the defendant's claim unclear; there is no evidence that [the] alleged deceitful statement made by the [d]etectives was actually false. Even if it were, under the circumstances of the defendant's interview, it does not amount to a recognized challenge."

On appeal, the defendant argues that the judge erred in denying his motion to suppress. Where a defendant challenges the admission of a statement allegedly resulting from custodial interrogation, the defendant bears the initial burden of proving custody. Commonwealth v. Larkin, 429 Mass. 426, 432 (1999). If the defendant satisfies this initial burden, the burden shifts to the Commonwealth to prove "a knowing, intelligent, and voluntary waiver of Miranda rights," Commonwealth v. Murphy, 442 Mass. 485, 492 (2004), and that any statement "was made voluntarily." Commonwealth v. Tremblay, 460 Mass. 199, 206 (2011).

Here, the judge correctly determined that the defendant was subject to custodial interrogation. The admissibility of the

defendants' statements at the interview, therefore, turns on voluntariness. Although the voluntariness of a Miranda waiver and the voluntariness of a particular statement made during custodial interrogation "are separate and distinct issues," the "test" for both is "essentially the same." Commonwealth v. Edwards, 420 Mass. 666, 670 (1995). "The test for voluntariness is whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act. . . . Under this totality of the circumstances test, [the court] consider[s] all of the relevant circumstances surrounding the interrogation and the individual characteristics and conduct of the defendant," including "promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings." Commonwealth v. Tremblay, 460 Mass. at 207 (quotations and citations omitted). The Commonwealth bears a "particularly heavy burden" because in Massachusetts voluntariness "must be shown beyond a reasonable

doubt." Commonwealth v. Hoyt, 461 Mass. 143, 152 (2011). See Commonwealth v. Tremblay, supra at 206.

As he did in the proceedings on the motion to suppress, on appeal, the defendant focuses his voluntariness challenge on Harris's purportedly false representation that the defendant was not under arrest. The defendant asserts that he "plainly attached special significance to the fact that he was not under arrest when the interrogation began," as evidenced by his "immediate invocation of his right to counsel upon learning . . . that he was in fact under arrest." Despite Harris's testimony, which the judge credited, that he did not know that the defendant was under arrest for possession of marijuana at the beginning of the interview, the defendant argues that Harris should be deemed to have "constructive knowledge" of the defendant's arrest status, based on the knowledge of other police officers.

We need not address the validity of the defendant's theory of "constructive knowledge." We conclude that, even if Harris's unintentionally false assurance that the defendant was not under arrest could constitute an instance of "deceit" or "trickery," it did not render the defendant's Miranda waiver or statements involuntary. Although "law enforcement officials must exercise caution when employing deception or trickery or when giving

assurances to a suspect during an interrogation[,] . . . we also have repeatedly held that such deception or trickery does not necessarily compel suppression of the confession or admission but, instead, is one factor to be considered in a totality of the circumstances analysis." Commonwealth v. Tremblay, 460 Mass. at 208. In particular, we have rejected the contention that "an officer's use of the standard interrogation tactic of 'minimization,'" by which the officer downplays the severity of the defendant's situation, "compels the conclusion that a confession is involuntary." Commonwealth v. DiGiambattista, 442 Mass. at 438-439. Instead, "[a]s always," we assess the effect of such minimization techniques "as part of the totality of the circumstances." Id. at 439.

In light of the totality of the circumstances, we do not believe that the defendant was misled as to the severity of his situation. He registered throughout the interview that he was in the homicide division at Boston police headquarters. Far from minimizing the defendant's suspected conduct, Harris repeatedly emphasized the seriousness of the incident under investigation. The detective's remarks throughout the interview clearly indicated that the defendant was suspected of being involved in a shooting and subsequent police chase. He stated, for instance, that "right now we have drama, somebody shot,

there's a car chase, there's guns, there's a foot chase, there's you." Harris's unintentionally false statement concerning the defendant's arrest status, therefore, did not render the defendant's waiver or statements involuntary.

The evidence of the defendant's alcohol and drug use does not alter this conclusion. Although "[s]pecial care must be taken in assessing a waiver and the voluntariness of the statements where there is evidence that the defendant was under the influence of alcohol or drugs[,] [a]n otherwise voluntary act is not necessarily rendered involuntary simply because an individual has been drinking or using drugs." Commonwealth v. Silanskas, 433 Mass. 678, 685 (2001), quoting Commonwealth v. Shipps, 399 Mass. 820, 826 (1987). See Commonwealth v. Murphy, 442 Mass. at 494. Here, Harris testified that the defendant did not exhibit behavior typically associated with individuals under the influence of drugs or alcohol, and we defer to the judge's determination that Harris's testimony was credible. See Commonwealth v. Tremblay, 460 Mass. at 205 ("Questions of credibility are the province of the motion judge who had the opportunity to observe the witnesses"). As to the recording of the interrogation, with respect to which this court stands "in the same position as the [motion] judge," Commonwealth v. Novo, 422 Mass. at 266 (citation omitted), our independent review

leads us to conclude that the defendant's alcohol and drug consumption did not render the defendant's conduct at the interview involuntary. During the interview, the defendant often repeated the detective's questions before replying; his answers are coherent and evince a concerted effort to rebut any involvement in the shooting and subsequent flight.

Finally, pursuant to our obligation under G. L. c. 278, § 33E, to review the "whole case," we note that, at several points during the interrogation, the detective indicated that the defendant's decision to "leave ugliness alone," by not explaining his involvement in the shooting, would make him "look like a cold-blooded monster"; that his "honesty [would be] gauged by everybody else who listens to what happens here"; and that "in this business it's all about how forthright you are with us." We repeatedly have expressed our disapproval of a "now-or-never" line of interrogation, which seeks to place pressure on a suspect by suggesting that the suspect's ability to offer an explanation in some future proceeding is contingent upon answering the interviewing officer's questions. See, e.g., Commonwealth v. Thomas, 469 Mass. 532, 542-543 (2014); Commonwealth v. Novo, 442 Mass. at 267. We particularly caution against a line of questioning that incorrectly suggests that a defendant's decision not to respond to police questioning could

be used against the defendant later to challenge his credibility at trial.  See Doyle v. Ohio, 426 U.S. 610, 611 (1976).

Here, however, Harris never expressly stated that the defendant's silence could be used against him.  Furthermore, he never stated that, by refusing to talk to police, the defendant would lose his right to testify at trial, cf. Commonwealth v. Novo, 442 Mass. at 268-269, or that the defendant would be barred from talking to police in the future if he chose to remain silent or invoked his right to consult with counsel, cf. Commonwealth v. Thomas, 469 Mass. at 542.  As soon as the defendant invoked his right to counsel, the interrogation promptly terminated.  In view of the totality of the circumstances surrounding the defendant's interrogation, therefore, we conclude that the defendant voluntarily waived his Miranda rights and that his statements were voluntary.

b.  Requested jury instruction on the offense of accessory after the fact.  At trial, the defendant asked the judge to instruct the jury on the offense of accessory after the fact. The judge denied the request.  Instead, in the course of instructing the jury on the law of "joint venture or aiding and abetting,"[3] the judge stated:  "It is not enough [to find the

_____

[3] In Commonwealth v. Zanetti, 454 Mass. 449, 467 (2009), we "adopt[ed] the language of aiding and abetting rather than joint

defendant guilty as an aider and abettor] to show simply that
the defendant aided after the fact with escaping from the scene
or disposing of weapons.  The government must prove he shared
the intent or had the intent to commit the crime at the time the
crime was committed."  On appeal, the defendant contends that
the judge's decision not to offer a full instruction on the
offense of accessory after the fact deprived him of his right to
present a defense guaranteed under the Sixth and Fourteenth
Amendments to the United States Constitution and the right to a
fair trial under the Fifth, Sixth, and Fourteenth Amendments to
the United States Constitution, as well as the cognate
provisions of the Massachusetts Declaration of Rights.

"[W]here a judge refuses to give . . . an instruction [on
the defendant's theory of the defense], it is reversible error
only if the requested instruction [1] was substantially correct;
[2] was not substantively covered in the jury charge; and
[3] concerns an important issue such that the failure to give
the instruction seriously impaired the defendant's ability to
present a given defense."  Commonwealth v. Deane, 458 Mass. 43,

---

venture."  We have, however, continued to refer to the theory of
"joint venture" in our case law, see, e.g., Commonwealth v.
Britt, 465 Mass. 87, 98 (2013), and the judge's instructions
here corresponded to the appropriate instructions for aiding and
abetting that we have articulated.  See Commonwealth v. Zanetti,
supra at 470-471 (Appendix).

59 n.15 (2010), citing <u>United States</u> v. <u>Gibson</u>, 726 F.2d 869, 874 (1st Cir.), cert. denied, 466 U.S. 960 (1984). The Federal circuit courts are split on the question whether a trial judge commits reversible error by declining to give an instruction on the offense of accessory after the fact. The United States Court of Appeals for the Eighth Circuit has held that such a refusal constitutes error. See <u>United States</u> v. <u>Brown</u>, 33 F.3d 1002, 1003-1004 (8th Cir. 1994). The court reasoned that, where the government does not charge a defendant as an accessory after the fact, "the accessory after the fact theory functions as a defense" because one "cannot be both the offender and the accessory after the fact for the same offense." <u>Id</u>. at 1004. The United States Court of Appeals for the First Circuit, by contrast, rejected this approach. See <u>United States</u> v. <u>Rivera-Figueroa</u>, 149 F.3d 1, 6-7 (1st Cir. 1998). The court observed that "[t]o give the jury an additional set of elements for an uncharged crime that is not a lesser included offense, and of which the defendant seemingly cannot be convicted, seems to us a recipe for confusion." <u>Id</u>. at 7. Rather, the court held that, "[w]here appropriate, the court can properly explain to the jury that the defendant's theory of the case is that he merely assisted in covering up the crime but did not participate in its commission," thereby reconciling the defendant's right to

instructions on his theory of the defense without risking juror confusion.  Id.

Our case law employs the approach adopted by the United States Court of Appeals for the First Circuit.  In Commonwealth v. Talbot, 35 Mass. App. Ct. 766, 777 (1994), the Appeals Court rejected the defendant's argument that the trial judge erred in declining to give an accessory after the fact instruction, observing that "[t]he judge's instructions clearly established . . . that the defendant could not be found guilty of murder if his only participation consisted of helping [another person] dispose of the body and assisting him to leave the scene."  To go beyond that point, by instructing the jury on the elements of the uncharged accessory after the fact offense, the court observed, would risk confusing the jury and "intimating that the jury must accept that theory in order to acquit him."  Id., quoting Commonwealth v. Therrien, 371 Mass. 203, 206 (1976).  See Commonwealth v. Deane, 458 Mass. at 59 ("The judge could have concluded that charging the jury on a crime with which the defendant was not charged could serve to mislead or confuse the jury.").

We adhere to the position articulated in Commonwealth v. Talbot, supra.  Here, as there, the judge's instructions clearly established that the defendant could not be found guilty of

murder if his only participation consisted of aiding another person after the fact in escaping from the police and disposing of weapons. Consistent with that instruction, defense counsel argued in closing that "[w]hat [the defendant] did right after [the shooting] is terrible, but he's not charged with it," and that the evidence regarding the defendant's role in the police pursuit was "only evidence that after the commission of a murder [the defendant] helped people get away, and that is not murder." Because the judge's instructions clearly indicated that the defendant could not be convicted of murder if the jury concluded that the defendant's role was indeed limited to aiding in the shooter's escape from police, the judge's refusal to instruct the jury on the elements of the uncharged offense of accessory after the fact did not deny the defendant a defense.

c. <u>Review under G. L. c. 278, § 33E</u>. We have reviewed the entire record and conclude that there is no basis to exercise our authority pursuant to G. L. c. 278, § 33E, to reduce the verdict of murder in the first degree or to order a new trial.

<u>Judgments affirmed</u>.