NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13217

COMMONWEALTH  vs.  JOSHUA HART.


Franklin.      September 15, 2023. - December 8, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Wendlandt, & Georges, JJ.


Homicide.  Constitutional Law, Admissions and confessions,
    Voluntariness of statement, Fair trial, Confrontation of
    witnesses, Sentence, Cruel and unusual punishment.  Fair
    Trial.  Evidence, Admissions and confessions, Voluntariness
    of statement, Hearsay, Testimonial statement.  Practice,
    Criminal, Capital case, Motion to suppress, Admissions and
    confessions, Voluntariness of statement, Venue, Fair trial,
    Hearsay, Confrontation of witnesses, Sentence.



    Indictments found and returned in the Superior Court
Department on December 19, 2016, and March 31, 2017.

    A pretrial motion to suppress evidence was heard by John A.
Agostini, J., and the cases were tried before him.


    Stephen Paul Maidman for the defendant.
    Cynthia M. Von Flatern, Assistant District Attorney, for
the Commonwealth.


    LOWY, J.  The defendant and his girlfriend entered an

elderly couple's home through an unlocked door, stabbed and

suffocated the two occupants of the house, and stole their

valuables.  They then fled the Commonwealth in the victims' car.

One of the victims died immediately, and the other died

approximately one month later.  Following a jury trial, the

defendant was convicted of two charges of murder in the first

degree.[1]

In this appeal, the defendant argues that his convictions

should be reversed on three bases:  (1) the defendant's

confession to law enforcement was involuntary and should have

been suppressed; (2) the trial should have been transferred to

another venue due to pretrial publicity; and (3) a victim's out-

of-court statement should have been excluded from evidence

because it was inadmissible hearsay and the victim did not

testify at trial.  The defendant further contends that,

considering his age at the time of the crimes, his sentences of

life without the possibility of parole constitute cruel or

unusual punishment.  Lastly, the defendant asks us to exercise

our authority under G. L. c. 278, § 33E, to order a new trial or

remand the case for resentencing.  We find no reversible error

in any issue raised by the defendant and, after plenary review,

no cause to exercise our powers under G. L. c. 278, § 33E.  We

therefore affirm the defendant's convictions.

---

[1] The defendant was also convicted of attempted murder, two counts of armed robbery, larceny of a motor vehicle, and fraudulent use of a credit card.

1.  Background.  We recite the facts the jury could have reasonably found, reserving certain details for our analysis of the issues.

a.  The attack on Thomas Harty and Joanna Fisher.  On October 5, 2016, the defendant and his girlfriend, Brittany Smith, decided that they would leave town in light of pending criminal charges and that they would break into a house to steal a car and money to effectuate their escape.  At around 7:30 P.M., they chose a specific house in Orange because the garage contained an older car, which they believed would be less likely to have a tracking system.  The defendant and Smith knew that there were two individuals inside the house, and they intended to intimidate the occupants of the house into providing money and the keys to the car.

The defendant and Smith both entered the garage of the house through an unlocked door, collected a socket wrench from the garage, and proceeded into the house.  As they walked through the kitchen towards the living room, each also picked up a knife from the kitchen counter.

Thomas Harty, the ninety-five year old homeowner, stood up from an armchair in the living room to confront the two intruders.  The defendant entered the living room, where he stabbed Harty in the neck and multiple times in the chest.  The

defendant then put a pillow over Harty's face until Harty ceased breathing.

Next, the defendant turned to Joanna Fisher, Harty's seventy-seven year old wife, who was nonambulatory and a full-time wheelchair user. Smith had already assaulted Fisher, and Fisher was lying on the ground. The defendant stabbed Fisher numerous times, stood on her stomach in an attempt to take the air out of her body, and put a pillow over her face to suffocate her.

The defendant and Smith proceeded to steal credit and debit cards, approximately $200, a cell phone, and a car. They then disabled the house telephones and fled.

b. Fisher's statements. At approximately 9:10 A.M. the following day, October 6, 2016, Cindy Sumner-Moryl arrived at the house. Sumner-Moryl was Fisher's nurse and had a scheduled appointment to assist Fisher with physical therapy exercises and other personal care needs. She and another care worker found the house in disarray, Harty motionless in the armchair in the living room, and Fisher on the floor in her bedroom. Fisher had a blanket over her legs, she was lying in a pool of blood, and there was blood on the side of her face. Sumner-Moryl testified as follows at trial:

> "I heard her moaning, so I went over to her right away. And she said, [']Cindy, is that you?['] And I said [']yes['] and she said [']invasion, ambulance.['] And I

reassured her that we had help coming and that she was safe. . . . I directed [the other care worker] to call 911. . . . And I stayed with Ms. Fisher to comfort her. . . . She wanted to know if she had a black eye and I said yes, she did. And she told me that they tried to kill her, that they kept putting a pillow over her face and tried to smother her[;] she said, [']But, I'm tough.['] Then she told me that she dragged herself out onto the porch and tried to call for help, but no one heard her."

Fisher was brought to the hospital for medical attention for stab wounds, loss of blood, rib fractures, and other abrasions and lacerations. Harty was declared deceased; Fisher died weeks later from complications arising from the attack.

c. The police investigation. Shortly after Sumner-Moryl found Fisher, police arrived at Harty and Fisher's home. There was evidence of an attack throughout the house. Harty lay lifeless in the armchair in the living room, and there were bloodstains across the living room -- on the floor, on multiple pillows, and on the chair in which Harty was found dead -- as well as in the rest of the house. The police found a socket wrench and a disabled cordless telephone on the dining room table, and a disabled cordless telephone in the living room.

Within hours of the attack, the police were notified that someone attempted to use Harty's credit card at a store in Worcester. The police then obtained photographs showing the defendant and Smith attempting to use Harty's credit card and successfully using Fisher's debit card there. A photograph and a video recording also showed the defendant and Smith in the

store's parking lot with Harty and Fisher's car. The police were first able to identify the defendant and Smith based on these photographs.

The police proceeded to speak with witnesses who stated that they saw the defendant and Smith together immediately before the attack. Surveillance footage from a small market further placed the couple together near the victims' house around the time of the attack, and the local police's bloodhound tracked Smith from the market to the victims' home based on the scent of a shirt Smith had been wearing shortly before the attack.

Forensic and physical evidence also tied the defendant and Smith to the crime scene. Rosary beads, matching a description from a rosary worn by the defendant on the night of the attack, were discovered on the living room floor and in the chair in which Harty was found. The defendant's fingerprint was found on a window shade behind Harty's body, and Smith's fingerprints were found on various windows around the house. A footwear impression consistent with the heel print of a Nike Air Jordan, the type of sneaker the defendant wore on the night of the attack, was found on the floor of the living room.

Massachusetts law enforcement tracked the defendant and Smith over the following days as the two assailants fled down the east coast. On October 8, 2016, Rockbridge County,

Virginia, deputy sheriffs (Virginia officers) arrested the defendant and Smith. The victims' car was found in a nearby U-Haul parking lot. The police later learned that the defendant and Smith had rented a U-Haul motor vehicle after the car had broken down. The defendant's and Smith's fingerprints were found in the car, along with Smith's pocketbook, a wallet with the defendant's MassHealth card, receipts showing purchases with Fisher's debit card, and an identification card for Harty.

d. The defendant's interrogations with law enforcement. Once in custody, the defendant immediately indicated that he wanted to speak with the Virginia officers. The Virginia officers, after consultation with Massachusetts law enforcement officers, agreed to meet with the defendant and brought him from his cell to an interview room. During an approximately one-hour long audio-recorded conversation, the defendant confessed to the attack on Harty and Fisher. The defendant also provided a sketch of the victims' house and a written confession.

The next day, two Massachusetts State police troopers (Massachusetts officers) met with the defendant in the Rockbridge County, Virginia, sheriff's office. This conversation was also audio recorded and lasted approximately two hours and ten minutes. The defendant again made numerous admissions detailing the crimes that he and Smith committed.

e.  The defendant's convictions and sentencing.  On April 13, 2018, following a jury trial, the defendant was convicted of murder in the first degree for Harty's death based on the theory of felony-murder; murder in the first degree for Fisher's death based on the theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder; and other charges.[2]  The defendant was sentenced to life without the possibility of parole for each conviction of murder in the first degree, to be served consecutively.

The defendant's codefendant, Brittany Smith, was subsequently and separately tried for and convicted of two charges of murder in the first degree for killing Harty and Fisher, among other charges.  See Commonwealth v. Smith, 492 Mass. 604, 604-605 (2023).

2.  Discussion.  a.  Voluntariness of confession.  The defendant argues that his rights under art. 12 of the Massachusetts Declaration of Rights and the Fifth Amendment to the United States Constitution were violated because the trial judge improperly denied the defendant's motion to suppress his

---

[2] As stated, the defendant was also convicted of attempted murder, two counts of armed robbery, larceny of a motor vehicle, and fraudulent use of a credit card.

allegedly involuntary confession to the Virginia officers.[3]  When
reviewing a trial judge's denial of a motion to suppress, we
"conduct an independent review of [the trial judge's] ultimate
findings and conclusions of law."  Commonwealth v. Tremblay, 480
Mass. 645, 652 (2018).  We review subsidiary findings of fact
with differing deference based on the type of evidence from
which the findings are drawn.  See id. at 655.  "[F]indings
drawn partly or wholly from testimonial evidence are accorded
deference and are not set aside unless clearly erroneous."  Id.
That is, such findings are set aside only if, although evidence
supports such findings, we are nonetheless "left with the
definite and firm conviction that a mistake has been committed"
after review of all the evidence (citation omitted).  Id. at 655
n.7.  On the other hand, we review de novo any findings based
entirely on documentary evidence.  Id. at 655.  Where we are
solely reviewing an audio recording of an interrogation, for
example, "we are in the same position as the motion judge to
determine what occurred during the interview."  Commonwealth v.
Hammond, 477 Mass. 499, 502 (2017).  We conclude, based upon the
judge's findings of fact from the evidentiary hearing, and our

---

[3] It is uncontested that the defendant was in custody and
that the conversation between the defendant and the Virginia
officers constituted interrogation.

independent review of the recording here, that the trial judge properly determined the defendant's statements to be voluntary.

A statement is presumed voluntary until a defendant produces any evidence showing otherwise.[4]  Commonwealth v. Tremblay, 460 Mass. 199, 206 (2011).  Once a defendant presents such evidence through a motion, affidavit, or proffer, the burden shifts to the Commonwealth to prove beyond a reasonable doubt that the statement was made voluntarily.  Id.  A voluntary statement is "the product of a 'rational intellect' and a 'free will,' and not induced by physical or psychological coercion" (citation omitted).  Hammond, 477 Mass. at 502.  More specifically, "[t]he test for voluntariness . . . is 'whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act'" (citation omitted).  Id.  "Under this 'totality of the circumstances' test, we consider all of the relevant circumstances surrounding the interrogation and the individual characteristics and conduct of the defendant"

---

[4] The rights to due process and against self-incrimination afforded to defendants under the Massachusetts Declaration of Rights are at least as protective as, if not even more expansive than, those afforded under the United States Constitution. Kligler v. Attorney Gen., 491 Mass. 38, 60 (2022). Commonwealth v. Mavredakis, 430 Mass. 848, 858-859 (2000).

(citation omitted).  Id.  The nonexhaustive list of relevant factors includes

> "promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation[, including the recitation of Miranda warnings]" (citation omitted).

Id. at 502 n.3.

The totality of the circumstances here demonstrates that the will of the defendant was not overborne when he confessed to the Virginia officers.  The interrogation lasted only approximately one hour, and the tone during the entirety of the interview was conversational rather than adversarial:  no one raised his or her voice, the Virginia officers never harassed the defendant, and the defendant never appeared agitated or intimidated by the Virginia officers.  Additionally, the defendant did not appear particularly vulnerable to coercion. He was an adult with a postsecondary education; he appeared physically healthy and mentally coherent; and he had had significant experience with the criminal justice system.  The defendant was able to recite the Miranda warnings himself -- saying that "[he knew] them very well" -- prior to the Virginia officers formally providing those warnings and obtaining a voluntary waiver.  The defendant initiated the conversation with

the Virginia officers and displayed an obvious desire to speak and confess to them. Indeed, the defendant specifically mentioned to the Massachusetts officers that he had "volunteered to talk" to the Virginia officers.

The defendant nonetheless contends that his statements were involuntary because the police (i) used a "now or never" interrogation tactic; (ii) used language minimizing the crimes; (iii) appealed to the defendant's religious beliefs; and (iv) made a promise to facilitate leniency for the defendant's girlfriend. We disagree.

i. "Now or never." A "now or never" interrogation tactic is one that "lead[s] a defendant to believe that the conversation with police will be his or her sole opportunity to tell his or her story." Commonwealth v. Miller, 486 Mass. 78, 92 (2020). The "now or never" tactic "casts substantial doubt on the voluntariness of a subsequent confession and on the integrity of the interrogation process leading up to it," and "[t]his doubt would be extremely difficult for the Commonwealth to overcome in any case." Id. at 93, quoting Commonwealth v. Novo, 442 Mass. 262, 269 (2004). This tactic was not used here, however. The Virginia officers encouraged the defendant to "take advantage of this opportunity to talk with [them]," but at no time insinuated that this was the defendant's "sole opportunity" to tell his story. Further, our prior cases have

found the "now or never" tactic problematic particularly in circumstances that have an impact on a defendant's right to counsel or right to testify before a jury. See Commonwealth v. Thomas, 469 Mass. 531, 541-542 (statement that "[t]his is your only opportunity to tell your story to us so that we can help you" would be improper "where a suspect has invoked her right to counsel"); Novo, supra at 268-269 (statement that if defendant did not speak to officers as to reason for his conduct, "a jury[ were] never going to hear a reason" was improper "misrepresentation of the defendant's right to defend himself at trial"). Here, the Virginia officers did not suggest in any way that not speaking now would have an impact on his right to counsel, his right to testify on his own behalf, or his right to represent himself.

ii. Minimization. We have explained that "the standard interrogation tactic of minimization is problematic" because describing a crime repeatedly "as understandable, justifiable, and not particularly serious" could imply a promise of leniency (citation omitted). Commonwealth v. Harris, 468 Mass. 429, 436 (2014). "Use of the tactic by itself, however, does not compel[] the conclusion that a confession is involuntary" (quotation and citation omitted). Id. See Hammond, 477 Mass. at 503-504 ("Minimization, combined with other factors, may render a confession involuntary . . ."). When analyzing the

impact of minimization on voluntariness, we look not only to whether law enforcement utilized minimization tactics, but also to whether the tactics caused the defendant to be "misled as to the severity of his situation." Commonwealth v. Newson, 471 Mass. 222, 231 (2015).

Here, the defendant's statements demonstrate that he was not misled into somehow believing the situation was not serious. The Virginia officers interrogating the defendant twice used minimizing language, categorizing the defendant's crimes as "a mistake" and "a lapse in judgment." But the defendant immediately disagreed with the Virginia officers: when one Virginia officer characterized the crimes as "a mistake," the defendant replied, "Well this is bigger than a little mistake." The Virginia officers also later stated to the defendant that "this is a pretty severe, heinous incident," to which the defendant agreed. Any minimization tactic employed here did not coerce the defendant to confess because "the defendant's actions reveal that he was able to decide what to tell the officers and could further identify the officers' tactics for what they were." Commonwealth v. Durand, 457 Mass. 574, 596-598 (2010), S.C., 475 Mass. 657 (2016), cert. denied, 583 U.S. 896 (2017). Indeed, even had the defendant been misled, the Virginia officers' use of minimization, without more, would not affect the outcome of our analysis here in the face of significant and

considerable evidence that the defendant sought to speak to law enforcement and then voluntarily did so consistent with his desire. See Commonwealth v. Cartright, 478 Mass. 273, 289 (2017), quoting Commonwealth v. DiGiambattista, 442 Mass. 423, 438-439 (2004) (explaining we "expressly disclaimed the suggestion that an officer's use of the standard interrogation tactic of minimization, by itself, compels the conclusion that a confession is involuntary" [quotations omitted]).

iii. Appeal to religion. In Cartright, we adopted the approach of some jurisdictions that "condemn 'the tactic of exploiting a suspect's [specific] religious anxieties,' but [do] not order suppression where the commentary on religion is limited and not 'calculated to exploit a particular psychological vulnerability of the defendant.'" Cartright, 478 Mass. at 289-291, quoting People v. Kelly, 51 Cal. 3d 931, 953 (1990), cert. denied, 502 U.S. 842 (1991). Here, the reference to religion was extremely limited, if present at all. The Virginia officers referenced Smith's "soul" only once.[5]

---

[5] The Virginia officer testified at the hearing on the motion to suppress that he was not seeking to invoke religion when he mentioned Smith's "soul," but instead was only attempting to reference Smith's "being." Cf. Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/soul [https://perma.cc/ZZY8-RUG7] (defining soul as "the immaterial essence, animating principle, or actuating cause of an individual life"). Further, the defendant stated that he was not very religious at the time of the interrogation, and it is

Moreover, there was no evidence that the Virginia officers were attempting to exploit the defendant's religious sensibilities or that the defendant's religious sensibilities were affected. The trial judge, in denying the defendant's motion to suppress, found that "the police were unaware of any religious affiliation of the defendant or of any personal religious sensibilities, particularly those that would be a means to break his will," and we have no reason to disagree with this finding. Accordingly, the singular reference to Smith's "soul" is insufficient to upend our conclusion that the defendant's statement was freely and voluntarily made.

iv. Promise of leniency. The defendant's remaining contention is that the Virginia officers promised leniency for his girlfriend in exchange for his confession. Officers may not make a threat concerning a person's loved one, such as threatening arrest and charging a loved one without any basis to do so or "expressly bargain[ing] with the defendant over the release of other individuals." Commonwealth v. Raymond, 424 Mass. 382, 396 (1997), S.C., 450 Mass. 729 (2008). See Commonwealth v. Colon, 483 Mass. 378, 389 (2019). However, this is not a case where the Virginia officers threatened the defendant as to his relationship with a loved one, contrast

therefore less likely that he would have interpreted the word "soul" in the spiritual sense.

Commonwealth v. Monroe, 472 Mass. 461, 469 (2015) (threats to defendant's ability to maintain contact with daughter characterized as coercion); or a case where the Virginia officers threatened to charge the defendant's girlfriend without any basis to do so, contrast Commonwealth v. Hunt, 12 Mass. App. Ct. 841, 842-843 (1981) (confession found to be involuntary where officers promised leniency for defendant's wife in exchange for defendant's confession even though officers never had probable cause to hold wife); or a case where the Virginia officers expressly assured the defendant that his girlfriend would be released if he confessed.

Instead, the Virginia officers simply provided a truthful response to the defendant's inquiry. Both the defendant and Smith were taken into custody by the Virginia officers under warrants based on probable cause. The defendant then requested to speak with the Virginia officers and, with urgency, raised the issue of his girlfriend's innocence and stated multiple times at the beginning of the interrogation that Smith was not responsible for what had occurred. Only after raising the issue of his girlfriend's lack of responsibility did the defendant, in reference to his girlfriend's then-alleged innocence, ask, "[D]o you think after we talk there's a way we could try to contact the police department down there and arrange something?" The

Virginia officer responded, If you're honest with me and you're telling me everything that's going on."

In this context, the Virginia officer's response was a truthful explanation of what he believed would be the benefit of the defendant's confession:  if the defendant was being honest when he stated that Smith was not involved in the killings, then leniency for Smith would likely result.  Explaining the truthful, natural result of a suspect's statement is permissible.  See Commonwealth v. Berg, 37 Mass. App. Ct. 200, 205-206 (1994); United States v. Hufstetler, 782 F.3d 19, 24 (1st Cir.), cert. denied, 577 U.S. 884 (2015) ("Without more, an officer's truthful description of the family member's predicament is permissible since it merely constitutes an attempt to both accurately depict the situation to the suspect and to elicit more information about the family member's culpability"); United States v. McWhorter, 515 Fed. Appx. 511, 518 (6th Cir.), cert. denied, 570 U.S. 912 (2013) (confession was voluntary where officer stated to suspect "that if he was responsible for all the criminal activity, the state would not be interested in prosecuting his wife"); United States v. Jones, 32 F.3d 1512, 1517 (11th Cir. 1994) (where agents truthfully told defendant that "unless [he] explained the participation of his girlfriend, she would continue to be considered a suspect," confession was found to be voluntary); Bruno v. State, 574 So.

2d 76, 79-80 (Fla.), cert. denied, 502 U.S. 834 (1991) ("Even taking into account that [the detective] later testified at the trial that he had told [the defendant] that if he gave a sworn statement exculpating his son, his son would not be charged, the record supports the conclusion that the confession was freely and voluntarily made[;] [t]he police legitimately believed that [the defendant's] son was involved but recognized that if [the defendant] gave a sworn statement exculpating his son there would be no basis upon which his son could be charged"); Bailey v. State, 473 N.E.2d 609, 610 (Ind. 1985) (confession was voluntary where defendant "was merely advised that [friend's release] would not be forthcoming without some basis for believing that, although the two were caught in the car with the goods, the friend had no knowledge of the burglary").

Indeed, the defendant's motivation for speaking with law enforcement, at its core, can be reduced to one driving force: his desire to protect his girlfriend. This desire, absent any illegitimate police tactics, does not render a confession involuntary. See Commonwealth v. Scott, 430 Mass. 351, 355 (1999) ("The defendant's concern for his sister is not enough to tip the balance where all other factors indicate that the defendant made his statement voluntarily"); Raymond, 424 Mass. at 396 ("a motive to protect his mother is not sufficient to find [the defendant's] confession involuntary" [citation

omitted]).  We thus conclude that the response of the Virginia officers to the defendant's inquiry concerning his potential cooperation did not detract from the voluntariness of his confession.

Under the totality of the circumstances, the defendant's statements to the Virginia officers were made freely and voluntarily.[6]

b.  Fair and impartial jury.  The defendant argues that his right to a fair and impartial jury as violated when the trial judge declined to change the venue of the trial despite local pretrial publicity of the crimes.  A trial judge "should exercise [the] power to change the venue of a trial with great caution" and only after the defendant has met his or her burden "to establish the 'solid foundation of fact' necessary to support a grant of the motion" (citation omitted).  Commonwealth v. Bateman, 492 Mass. 404, 430 (2023).  "The mere existence of pretrial publicity, even if it is extensive, does not constitute a foundation of fact sufficient to require a change in venue" (citation omitted).  Id.  Rather, the defendant must establish that the pretrial publicity created presumptive prejudice or

---

[6] As the defendant makes no independent claim of coercion during his interview with the Massachusetts officers, and as we find that no coercion occurred upon our own review of the interrogation, the defendant's statements to the Massachusetts officers were likewise voluntary.

actual prejudice. Id. The trial judge has "substantial discretion" to decide the motion, and we review the trial judge's decision for abuse of discretion (citation omitted). Id. at 431. Indeed, "[i]n evaluating the risk of prejudice posed by pretrial publicity, we give careful attention to the evaluation of the trial judge, especially one who, as here, presides in the county where the crime occurred and is familiar with the nature and pervasiveness of the pretrial publicity." Id. We conclude that the trial judge did not abuse his discretion because the pretrial publicity caused neither presumptive nor actual prejudice.

Presumptive prejudice "exists only in truly extraordinary circumstances" and where the trial atmosphere had become "'utterly corrupted' by media coverage." Bateman, 492 Mass. at 431, quoting Commonwealth v. Toolan, 460 Mass. 452, 463 (2011), S.C., 490 Mass. 698 (2022), and Commonwealth v. Entwistle, 463 Mass. 205, 221 (2012), cert. denied, 568 U.S. 1129 (2013). There are two factors that are central to this analysis: (1) whether the nature of the pretrial publicity was "both extensive and sensational;" and (2) "whether the judge was in fact able to empanel jurors who appear impartial" (citation omitted). Bateman, supra. First, the defendant referenced only eleven news reports in his motion to change venue, almost all of which were in the immediate aftermath of the crimes themselves

(i.e., almost one and one-half years prior to the trial) and only contained factual descriptions of the relevant events. This publicity was insufficiently "all-consuming and constant" to be even close to extensive. Id. at 432. See Commonwealth v. Hoose, 467 Mass. 395, 406-407 (2014) (sixteen articles "did not constitute pervasive publicity because they appeared in a small number of local news sources and the intensity of the reporting decreased over time with no articles appearing between January, 2010, and the time of the judge's ruling in April, 2010"). Nor was the publicity sufficiently sensational. See Bateman, supra, quoting Hoose, supra at 407 ("Publicity is sensational when it contains emotionally charged material that is gratuitous or inflammatory, rather than a factual recounting of the case").

Second, less than twenty percent of potential jurors were excused during voir dire due to pretrial publicity exposure. We have required a "high percentage of the venire" to be prejudiced as a result of pretrial publicity to show that the judge could not have empanelled an impartial jury. Hoose, 467 Mass. at 407-408. Twenty percent of the venire does not meet this requirement for presumptive prejudice. See Commonwealth v. Morales, 440 Mass. 536, 541-542 (2003) (claim of presumptive prejudice rejected where approximately twenty-five percent of venire was disqualified for exposure to media coverage); Commonwealth v. Angiulo, 415 Mass. 502, 515 (1993) (claim of

presumptive prejudice rejected where forty-two percent of venire was excused). We thus find no presumptive prejudice.

"To demonstrate actual prejudice, a defendant must show that, in the totality of the circumstances, pretrial publicity deprived . . . him of his right to a fair and impartial jury." Hoose, 467 Mass. at 408. "[T]he voir dire procedures utilized by the judge are particularly important" in this analysis. Id. Here, the trial judge was cognizant of the issue and took careful, deliberate, and extensive steps to protect the defendant's right to a fair and impartial jury. The judge conducted a thorough and individual voir dire of each potential juror, allowed both counsel and the prosecutor to ask questions during the individual voir dire, on a daily basis reminded seated jurors not to discuss the case with anyone and not to come into contact with any media accounts of the case, inquired when the jurors returned to the court whether anyone had come into contact with any information related to the case, and noted on each trial day their lack of affirmative responses for the record. These guardrails were sufficient. See Hoose, supra at 409. See also Smith, 492 Mass. at 610-611 (no actual prejudice from pretrial publicity in codefendant's trial). We therefore find no actual prejudice.

Accordingly, the trial judge did not abuse his discretion in denying the defendant's motion to change venue, and the defendant's right to a fair and impartial jury was not violated.

c. Fisher's statements. The defendant contends that Sumner-Moryl's testimony, communicating Fisher's statements on the morning after the attack, contained inadmissible hearsay and was violative of his right to confront witnesses against him.

i. Spontaneous utterance.[7] The defendant specifically argues that the trial judge erred by allowing Fisher's out-of-court statements in evidence as a spontaneous utterance. Where a hearsay issue was properly preserved, as it was here,[8] we review the issue for prejudicial error. Commonwealth v. Cheremond, 461 Mass. 397, 411 (2012). An error is not prejudicial if it "did not influence the jury, or had but very slight effect" (citation omitted). Commonwealth v. Cruz, 445 Mass. 589, 591 (2005).

Here, we need not decide whether the trial judge erred in admitting Fisher's statements because, even assuming error,

---

[7] Courts and litigants alike have used various terms to describe this hearsay exception, including "spontaneous exclamation," "spontaneous utterance," "excited utterance," and others. We reiterate that we will use the term "spontaneous utterance." Commonwealth v. Gonsalves, 445 Mass. 1, 4 n.1 (2005), cert. denied, 548 U.S. 926 (2006).

[8] The defendant filed a motion in limine to exclude this testimony, which is sufficient to preserve the issue. Commonwealth v. Grady, 474 Mass. 715, 719 (2016).

there was no resulting prejudice.  Fisher's statements contained only three inculpatory facts:  there was an invasion into her home, she had a black eye, and multiple individuals attempted to suffocate her.  The Commonwealth presented other compelling admissible evidence of all these facts in various forms: forensic and physical evidence showed that the defendant invaded the victims' home, a police officer and a doctor each testified as to Fisher's injuries, and the defendant himself confessed to all these facts in detail.  Fisher's statements were thus duplicative and, at most, had "but very slight effect" on the jury (citation omitted).  See Cheremond, 461 Mass. at 411 (no prejudice where, even though it was error to admit victim's statements to prove motive and nature of parties' relationship, abundance of admissible evidence was presented to prove these two facts).  The Commonwealth presented a strong case, and the defendant therefore suffered no prejudice even if Fisher's statements were admitted in error.  Accordingly, we find no reversible error.

ii.  Confrontation clause.  The defendant also asserts that admitting Fisher's statements violated his right to confrontation under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.  See Commonwealth v. Linton, 456 Mass. 534, 550 n.11 (2010), S.C., 483 Mass. 227 (2019).  In contrast to our review

of hearsay evidence, if we do find error, "we evaluate the admission of constitutionally proscribed evidence to determine whether it was harmless beyond a reasonable doubt" (citation omitted).  Commonwealth v. Rand, 487 Mass. 811, 814-815 (2021).

We have interpreted the confrontation clause to "bar[] the admission of testimonial hearsay by a declarant who does not appear at trial, unless the declarant is unavailable to testify as a matter of law and the defendant had an earlier opportunity to cross-examine him or her."  Commonwealth v. McGann, 484 Mass. 312, 316 (2020).  Nontestimonial hearsay, however, does not violate the United States Constitution or the Declaration of Rights.  Rand, 487 Mass. at 815.  We conclude that Fisher's statements were nontestimonial and that, therefore, there was no constitutional violation despite Fisher being unable to appear at trial.

"Testimonial statements are those made with the primary purpose of 'creating an out-of-court substitute for trial testimony'" (citation omitted).  Commonwealth v. Brum, 492 Mass. 581, 596 (2023).  "The inquiry is objective, asking not what that particular declarant intended, but rather 'the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances'" (citation omitted).  Id.  Although "[a]n ongoing emergency is not necessary for a statement to be nontestimonial,

. . . when one is present it takes a central place in our analysis." Rand, 487 Mass. at 817. "The reason for this is straightforward: when preoccupied by an ongoing emergency, a victim is unlikely to have the presence of mind to create a substitute for trial testimony." Id. "Factors bearing on the existence of an ongoing emergency include (1) whether an armed assailant poses a continued threat to the victim or the public at large, (2) the type of weapon that has been employed, and (3) the severity of the victim's injuries or medical condition" (citation omitted). Id. A victim's medical condition, in particular, "sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one." Id. at 824, quoting Michigan v. Bryant, 562 U.S. 344, 365 (2011).

Fisher unquestionably had extreme and near-fatal injuries when she made her statements: she was stabbed with multiple knives, suffocated, brutally beaten, and left on the ground to die. After repeatedly crying out for help without any response for over twelve hours, Fisher finally had an opportunity to speak to someone who could assist her. We find that Fisher's statements were made in the throes of an ongoing emergency in light of these circumstances.

The defendant contends that, even if the conversation between Fisher and Sumner-Moryl had begun during an ongoing emergency, Fisher's statements turned testimonial once she was told that "help was on the way."  The emergency did not end in the middle of the conversation, however:  "[j]ust because an ambulance has been called does not mean that any potential medical emergency has dissolved."  Rand, 487 Mass. at 825.  In particular, "it was prudent for [Sumner-Moryl] to continue collecting medical information from the victim in case [she] needed to relay it to paramedics upon their arrival."  Id. at 825-826.

While the ongoing emergency here, in and of itself, was enough for Fisher's statements to constitute nontestimonial hearsay, we mention two additional factors present here: "(1) the formality [or informality] of the statements, and (2) the nature of 'the statements and actions of both the declarant and interrogators'" (citation omitted).  Id. at 817. These factors only further support a finding that Fisher's statements were nontestimonial.  The exchange between Fisher and Sumner-Moryl "was informal and very brief, which was consistent with an interview whose purpose was to respond to an emergency rather than to develop a case for prosecution."  Commonwealth v. Beatrice, 460 Mass. 255, 263 (2011).  Indeed, far from being a formal account of what transpired, Fisher's statements were

devoid of any identification of the assailants -- information that a reasonable person who intended to provide a substitute for trial testimony might have provided.  See Commonwealth v. Mulgrave, 472 Mass. 170, 180 (2015) ("Further, she did not name the defendant, a fact likely to be communicated by a declarant attempting to establish her perpetrator's identity"); Commonwealth v. Middlemiss, 465 Mass. 627, 636 (2013) (statements "were concerned primarily with assessing the victim's medical condition and collecting as much information as possible to prepare first responders for what they would soon encounter" and were, therefore, not testimonial).

Lastly, that Fisher was speaking with a health care professional rather than law enforcement weighs heavily in favor of her statements being nontestimonial.  Although the United States Supreme Court has declined to adopt a categorical rule excluding statements to individuals other than law enforcement from the reach of the confrontation clause, "such statements are much less likely to be testimonial than statements to law enforcement officers."  Ohio v. Clark, 576 U.S. 237, 246 (2015).

In sum, for twelve hours, Fisher was lying on the ground on the verge of death near her husband, who had been viciously murdered in front of her.  She was without any ability to contact the outside world despite crawling outside and attempting to attract help.  When she was finally given a chance

to speak to a health care professional through her pain and anguish, she provided only the most basic of details. The ability for a reasonable person in Fisher's position to think about anything other than obtaining medical assistance or the horror of what she continued to endure, such as creating trial testimony, is remote in the extreme. We conclude that Fisher's statements were nontestimonial and that, accordingly, there was no confrontation clause violation.

d. Sentencing. The defendant contends that his two sentences of life without the possibility of parole are cruel or unusual punishment under art. 26 of the Massachusetts Declaration of Rights because he was less than twenty-five years old at the time of the offenses. In Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 671 (2013), S.C., 471 Mass. 12 (2015), we declared that the Legislature's authorization of life sentences without the possibility of parole for juveniles (i.e., those under eighteen years of age) was unconstitutional. The defendant, however, "has provided no evidence of any circumstance that plausibly could suggest that the known research on adolescent brain development, and its impact on adolescent behavior, ought to extend to individuals who are [under the age of twenty-five]." Commonwealth v. Yat Fung Ng, 491 Mass. 247, 271-272 (2023). We thus find no error in the defendant's sentencing.

e. _Review under G. L. c. 278, § 33E._  Having reviewed the entire record in accordance with our duty under G. L. c. 278, § 33E, we discern no reason to reduce the degree of guilt or to order a new trial.[9]

_Judgments affirmed._

---

[9] Pursuant to our review under G. L. c. 278, § 33E, we note that there may be an issue whether the convictions of attempted murder and murder in the first degree resulting from the defendant's attack of Fisher constitute inconsistent verdicts and, if so, whether reversal of the conviction of murder in the first degree for the killing of Fisher is required. Inconsistent verdicts generally do not raise issues of concern. See _Commonwealth_ v. _Resende_, 476 Mass. 141, 147 (2017).  Here, however, there may be an issue of concern due to an error in the trial judge's instruction on attempted murder.  In particular, the trial judge instructed the jury that they must find that "the defendant's act did not result in the completed crime" in order to find the defendant guilty of attempted murder.  But "nonachievement of murder is _not_ an element of attempted murder" (emphasis added).  _Commonwealth_ v. _LaBrie_, 473 Mass. 754, 765 (2016).  The jury then found the defendant guilty of attempted murder and murder in the first degree for the killing of Fisher. Accordingly, due to the instruction error, the jury found that the defendant's attack "did not result in [murder]."  Yet the jury also found the defendant guilty of murder in the first degree and, therefore, found that the defendant's attack resulted in Fisher's death.  If these are legally inconsistent verdicts, "[both verdicts] must be set aside."  See _Resende_, _supra_.  Should the defendant choose to raise this issue, he may do so directly in the Supreme Judicial Court due to potential constraints involving gatekeeper petitions.